UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA            CR07-0621 (A.R.R.)

            - *v* -

KARIM GOLDING,
         Defendant

-------------------------------------------------------------x

SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF A REDUCED SENTENCE
FOR KARIM GOLDING

HARRY C. BATCHELDER, JR.
Counsel for Karim Golding
40 Wall Street
Twenty-Eighth Floor
New York, New York 10005-1313
212-502-0660

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                              CR 07-0621 (A.R.R.)

       -   v   -

KARIM GOLDING,
               Defendant

------------------------------------------------------------x

## Factual Background[1]

In October of 2005 Karim Golding, hereinafter Golding, was twenty years old, living in Queens. He had one prior conviction for possession of a weapon. Golding in 2004 commenced interning with a local record label and in 2005 was continuing his efforts to become engaged full time in the music industry. In 2005 Golding, although still an intern, became involved in the business affairs of GF Records which was a subsidiary of the well known Koch Records label. In that same year Koch released an album entitled "God Giveth and God Taketh Away."

The principal actors in the artistic genesis of the album were Domination and Dice. The album garnered some success and a follow up album was planned but unfortunately Dice's

---

[1] Counsel incorporates by reference the previously filed Objections on Behalf of Karim Golding to various aspects of the Revised Presentence Investigation of October 26, 2012, dated September 17, 2014, and the Sentencing Memorandum on Behalf of Karim Golding at sentencing remand proceeding dated September 17, 2014.

1

probation was violated and he was incarcerated. At this point one Jew Jew, a recently released convict and convert to Hasidic Judaism, along with a Government undercover agent, offered to assist in "showing support" at the violation hearings for Dice. They wrote letters and appeared in court on Dice's behalf as a favor to Golding.

Subsequently, about a year later, Jew Jew and the undercover approached Golding, using the favors they had done for Dice, to purchase some guns as Jew Jew said he needed guns to protect his family as a result of Muslim/Jewish conflict in the Newburgh area.

Golding advised Jew Jew and the undercover that he did not sell guns. After every court appearance in Dice's matter Jew Jew and the undercover advise, and ratchet up the request for guns, implying that since their appearance is doing Golding a favor Golding should reciprocate. Golding relents. A transaction subsequently ensues in which Golding receives guns from Domination's sister-in-law and delivers them to Jew Jew. Significantly, Golding made no money on this transaction.

Jew Jew and the undercover become involved, without Golding's knowledge, with Domination in some small drug transactions. Subsequently, Domination goes missing and Jew Jew continuously contacts Golding about the delivery of drugs. Golding, because of Jew Jew's criminal past, which involved a history of murder for hire and a reputation as a hit man, attempts to get Jew Jew "off his back" by obtaining drugs for him.

After several unsuccessful attempts to obtain crack Golding, through the efforts of J.D. "Pretty" is able to obtain an ounce of cocaine and a gun. Golding made no money on this transaction. Golding's last transaction involved the sale of three ounces of crack which turned

out to be "beat" and which subsequently resulted in the discharge of a weapon. This is the complete background to Golding's criminal conduct.[2]

At the time of sentencing Golding was twenty-four years old, and had carpentry, photography, and internet marketing skills. He received a sentence of twenty years which almost equaled the span of his natural life to the time of sentencing. Golding will, at the time of sentencing advise the Court what the sentencing has done for him. At this point, because of the length of his sentence, the Bureau of Prisons cannot offer any program of substance to improve his skills, professional training or mindset.

POINT ONE

THE COURT HAS THE POWER TO DO JUSTICE

In a beyond groundbreaking decision Judge John Gleeson, with the concurrence of the United States Attorney, sentenced Francois Holloway to a dramatically reduced term of imprisonment based upon the commonsense view that the stacking of 924(c) convictions resulted in a draconian sentence that served nobody's interest and purpose. See, "Memorandum Regarding the Vacatur of Two Convictions Under 18 U.S.C. §924(c) ", United States v. Francois Holloway, 95 C.R 78 (J.G.) July 28, 2014. No one could accuse Judge Gleeson of picking "just the right vehicle" to exercise his power as Holloway stole three cars at gunpoint during a two day span and a cooperator's trial testimony was to the effect that Holloway intended to use the gun if any of the victims resisted. There are many parallel sentencing considerations between Golding and Holloway.

    (A)    REHABILITATIVE PROGRAMS

Golding, unlike Holloway who waited beyond a decade to commence his programs, started his attempt at rehabilitation immediately and in thirty months at Herlong completed nine

---

[2] Counsel believes the Government will confirm in the main the above factual background.

3

courses, to wit: parenting, vocational trade, computer course, refereeing sports course, forty hour drug program, small business course and a job fair certificate. Because of the length of his sentence there are no additional courses open to Golding.

    (B)    DISCIPLINARY RECORD

Golding, by his own admission, will advise the Court that for the first two years his disciplinary record was not the best, but in the last six years it has been exemplary. It also should be noted that Golding is serving his sentence in a most violent institution, some three thousand miles from a support system and has not seen his mother, for financial reasons, during the period of his incarceration at Herlong. Additionally, he worked at the institution. Holloway was 37 when he commenced his odyssey. Golding was 22. Holloway had a support system over many years that filled the courtroom at the time of his resentencing; Golding was geographically isolated, and traveled his road almost solitary—an extraordinary journey by any yardstick.

If one steps back and takes into consideration all of the 3553(a) factors, including Golding's young age at the time of sentencing—a sentence of ten years—now one third of his life to date—should satisfy the most rabid adherent of general and specific deterrence.

POINT TWO

THE DRUG EQUIVALENCY TABLE IS NOT BASED UPON EMPIRICAL RESEARCH AND THE COURT SHOULD REJECT THE CONVERSION TO MARIJUANA FOR SENTENCING PURPOSES.

The Probation Report asserts that Golding is responsible for the distribution of 26.58 grams of cocaine powder and 189.78 grams of crack cocaine.[3] Applying the Drug Equivalency Table the Probation Department finds Golding responsible for 83.016 kilograms of marijuana.

---

[3] Point One addresses counsel's view that this number should be reduced by 55 grams as the transaction was clearly that of one J.D. Pretty which would mean he is responsible for only 134.78 grams. However, counsel will utilize for purposes of argument the Probation report's assessment, but does not concede the validity of the amount.

4

To adopt Probation's analysis is to descend into the realm of Ouija board sentencing. Why so harsh?

Anyone involved in narcotics enforcement and defense from day one realizes that the amount of money involved in a drug transaction determines the seriousness of a transaction. Golding participated in the following narcotics transactions:

| | |
|---|---|
| June 15, 2006 | Golding and Devon Davis sold one ounce of crack cocaine to An undercover officer for $925. |
| June 22, 2006 | Golding and Davis sold the undercover 55.32 grams of cocaine For $1,845. |
| June 29, 2006 | Golding sold 26.58 grams of cocaine powder for $900. |

Golding received $3,670.00 for his narcotics sales. Yet, applying the Equivalency Table to the sales, the Probation Department assesses Golding responsible for 683.016 kilograms of marijuana. The World Drug Report assigns in 2006 a value of $2,300 a kilogram for marijuana. This results in a figure in excess of one million five hundred thousand dollars. ($1,500,000.00) This violates every tenet of commonsense and illustrates par excellence the disconnect between the Equivalency Tables and comparable costs of drugs when converted into a marijuana equivalency. Counsel requests the Court exercise its discretion under Kimbrough v. United States, 552 U.S. 85(2007) and Spears v. United States, 555 U.S. 261, 264 (2007) and sentence Mr. Golding on a 1 to 1 ratio for crack and powder cocaine.

Although not on all fours, the recent case of United States v. Chin Chong, No. CR 13-CR-570 (J.B.W.) presents in a harsh light the DEA's and the Sentencing Commission's flawed reasoning on the creation and use of Drug Equivalency Tables for sentencing purposes.

Initially, it is clear that Chong decision involves a substance that is not referenced by the Guidelines which is not the issue here. What is the issue is the methodology used to create the

5

Equivalency Guidelines and to state it is sparse is an understatement. Just for starters, how can a $3,800 transaction be transformed into a $1,500,000 transaction?

## CONCLUSION

### THE COURT SHOULD SENTENCE KARIM GOLDING TO TEN YEARS INCARCERATION

Dated:   February 9, 2015
         New York, New York

                              Respectfully submitted:


                              /s/:  Harry C. Batchelder, Jr.

                              _____
                              HARRY C. BATCHELDER, JR.
                              Counsel for Karim Golding
                              Twenty-Eighth Floor
                              40 Wall Street
                              New York, New York 10005-1313
                              212-502-0660
                              Email:  Lubiyanka@aol.com


Certificate of Service

       I hereby certify that the above document was served to the following on February 9, 2015 in the manner specified:  Via ECF to the Office of the United States Attorney for the Eastern District of New York and via United States Postal Service to Office of United States Probation, Eastern District of New York.


                              /s/:  Harry C. Batchelder, Jr.
                              _____
                              HARRY C. BATCHELDER, JR.